Nina Eisenberg (SBN – 305617)
neisenberg@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Attorneys for Plaintiff and the Putative Classes*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| JASON COOPER, individually and on behalf of all others similarly situated, | Case No.: 17-cv-2340 |
| *Plaintiff,* | **CLASS ACTION COMPLAINT FOR:** |
| v. | (1) **Violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*; and** |
| SLICE TECHNOLOGIES, INC., a Delaware corporation, and UNROLLME INC., a Delaware corporation, | (2) **Violations of the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.*** |
| *Defendants.* | **DEMAND FOR JURY TRIAL** |

Plaintiff Jason Cooper brings this Class Action Complaint and Demand for Jury Trial against Defendants Slice Technologies, Inc. and UnrollMe Inc., to stop their practice of unlawfully mining and selling data collected from the private emails of millions of unwitting consumers. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.     While millions of Americans have come to rely on email as a primary form of

1    communication for their business and personal lives, their inboxes are increasingly being bogged

2    down with the over 260 billion spam emails and advertisements sent daily. Defendant UnrollMe

3    sought to capitalize on these frustrations and, in 2011, was founded specifically to "clean up your

4    inbox."[1]

5          2.      Since its inception, Defendant UnrollMe has held itself out as a free web service

6    with the sole purpose of allowing users to easily unsubscribe from mailing lists, newsletters and

7    other annoying emails.

8          3.      Under the disguise of being a consumer friendly "email management" service,

9    UnrollMe was able to mislead millions of consumers into granting them virtually unfettered access

10   into their private and sensitive email inboxes. That is because users need to grant UnrollMe access

11   to their email accounts (such as Gmail or Outlook) so that UnrollMe can identify and automatically

12   unsubscribe them from any unwanted messages. What UnrollMe does not draw attention to is that

13   once it gets access to users' inboxes, it actually scans their emails, extracts a variety of data points,

14   and then, through its parent company Defendant Slice Technologies, Inc. (doing business as Slice

15   Intelligence), sells that data to third parties seeking to profile and target you. The New York Times

16   recently reported one particular instance where Slice gathered data from thousands of UnrollMe

17   users' emails who used the Lyft ridesharing service and then sold that highly valuable data to Uber

18   (Lyft's largest competitor). With that information, Uber was able to gain a competitive edge at the

19   expense of UnrollMe users' privacy.

20         4.      Defendants did not adequately disclose to consumers the true purpose for why they

21   seek access to UnrollMe users' emails for an important and obvious reason: few (if any)

22   consumers would knowingly hand over complete access to their private emails to a company that

23   would invasively scour through them and then sell the data they gather about you to whoever

24   would pay the most.

25         5.      In the end, Defendants misused the limited permission consumers granted to

26

27   _____
     [1]        Unroll.Me, https://unroll.me (last visited Apr. 26, 2017).

28

UnrollMe and unlawfully profited from it. Accordingly, this putative class action seeks (1) to prevent Defendants' unlawful interception and reading of consumers' emails, and (ii) statutory and punitive damages for violations under the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.* ("ECPA") and the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.* (the "SCA").

## PARTIES

6.      Plaintiff Jason Cooper is a natural person and citizen and resident of the State of Michigan.

7.      Defendant Slice Technologies, Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 800 Concar Drive, San Mateo, California 94402. Defendant Slice conducts business throughout this District, the State of California, and the United States.

8.      Defendant UnrollMe Inc. is a corporation existing under the laws of the State of Delaware, with its principal place of business located at 222 Broadway, New York, New York 10038. Defendant UnrollMe is a subsidiary of Defendant Slice. Defendant UnrollMe conducts business throughout this District, the State of California, and the United States.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the ECPA and SCA, which are federal statutes. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of each of the putative Class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under the subsection apply to this action.

10.     This Court has personal jurisdiction over Defendant Slice because it is headquartered in this District, conducts significant business in this District, and the unlawful conduct alleged in this Complaint occurred in and emanated from this District. This Court has personal jurisdiction over Defendant UnrollMe because it conducts significant business in this

District, enters into contracts in this District, and the unlawful conduct alleged in this Complaint occurred in and emanated from this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant Slice maintains its headquarters and principal place of business in this District and a substantial part of the events giving rise to Plaintiff's Complaint occurred in this District.

### INTRADISTRICT ASSIGNMENT

12.     Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division.

### FACTUAL BACKGROUND

**I.     UnrollMe's "Email Management" Service Serves as a Backdoor Data Collection Tool for Data Miner, Slice Intelligence.**

13.     In 2011, UnrollMe was launched specifically to help consumers tackle the deluge of unwanted emails cluttering their inboxes. By signing up with UnrollMe, consumers could purportedly rid their email inboxes of junk by allowing users to mass unsubscribe from spam messages and also by allowing them to group categories of emails into a single email digest that would be sent to the user daily. In exchange, UnrollMe could display daily advertisements to users via the digests and offer them new productivity products or services over time.

14.     In 2014, Defendant Slice purchased UnrollMe. While Slice Intelligence is not a household name, it has become a major data mining company that claims to turn data from over 4.2 million online shoppers "into actionable insights, furnishing brands and retailers with the answers to essential questions about digital commerce . . . ."[2]

15.     Slice gathers its data using "technology that automatically identifies e-receipts within [email] inboxes, extract[ing] every available data point about every purchase at the item level" from a "panel" of online shoppers.[3] That's where UnrollMe comes in.

---

[2]     *Methodology*, Slice Intelligence, https://intelligence.slice.com/methodology/ (last visited Apr. 26, 2017).

[3]     *Id.*

16.     Slice's access to the millions of UnrollMe's users' inboxes provides it with the data it recognizes is "of unparalleled quality, granularity and comprehensiveness. Data is reported daily at the item level, by zip-code and across all retailers, all categories, on any and all devices which a purchase was made. This is high definition data."[4]

A.      _Conspicuously absent from UnrollMe's registration process and marketing materials is any mention that Defendants will mine your emails for valuable data._

17.     Unfortunately, UnrollMe does not adequately disclose its true business model, recognizing that few (if any) consumers would knowingly hand over their private emails to a company if they knew they would invasively scour through their messages for the purpose of selling their data to whoever would pay the most. As such, UnrollMe disguises itself as a friendly "email management" service in order to mislead consumers into signing up for it and, in turn, granting it access to their private email inbox. (_See_ Figure 1, showing a screenshot of UnrollMe's marketing materials contained on its website.)



(**Figure 1.**)

18.     Not surprisingly, nowhere during the sign up process does UnrollMe disclose that it will scour your emails for "valuable data points" and then sell that information through Slice.

---

[4]     _Id._

1  Instead, UnrollMe continues to present prospective users with advertisements about how UnrollMe

2  is merely designed to allow users to get a "cleaner inbox." (*See* Figure 2, showing a screenshot of

3  UnrollMe's registration process.)



(**Figure 2.**)

13  19.    If a prospective user continues with the sign up process depicted above, UnrollMe

14  will eventually display a link to its terms of use and privacy policy shown in Figure 3. However, as

15  described in detail in Section II below, even there UnrollMe does not adequately disclose its true

16  business model.



(**Figure 3.**)

20.    For sake of completeness, the prospective user connecting UnrollMe to their

Google email account, for example, would next be asked by Google if UnrollMe could receive

certain "permissions" to access their email account. (*See* Figure 4, showing a screenshot of

Google's permission screen for UnrollMe.)

1

2

3

4

5

6

7

8

9

10



11 (**Figure 4.**)

12    21.    If the prospective user selects "Allow," UnrollMe claims to conduct an initial

13 search for subscription emails that the user can use UnrollMe to unsubscribe from. (*See* Figure 5,

14 showing a screenshot of UnrollMe's graphical user interface.)

15

16

17

18

19

20

21 (**Figure 5.**)

22    22.    As shown in Figure 5, UnrollMe claimed to have "found 25 subscriptions" that the

23 user could unsubscribe from to "clean [their] inbox & take a break from email spam." After the

24 user pressed continue and selected which emails to unsubscribe from, UnrollMe claimed that the

25 user is "all set" and that the UnrollMe would continue into the future to "find new subscriptions"

26 as shown in Figure 6, below.

27

28

(**Figure 6.**)

B.   *UnrollMe disguises itself as a friendly "email management" service to mislead consumers into signing up for it.*

23.     As Figures 1–6 show, UnrollMe appears to be fairly straightforward. UnrollMe claims to declutter your email inbox and, in line with that, asks for permission specifically to access consumers' email accounts to "find new subscriptions" from which they can use the service to unsubscribe from.

24.     Unfortunately, claiming to be a friendly and useful email service is just a disguise to get access to the valuable information contained in your emails. Defendants overstep the level of permission consumers grant to UnrollMe and secretly enroll them in Slice's "online panel of shoppers"—where they surreptitiously scan consumers' emails, harvesting them for valuable data, and sell that data to the highest bidder.

25.     In fact, a well-respected tech journalist, Mike Isaac of The New York Times, recently reported one instance where these supposedly "commercial transactional messages" were collected by Defendants and then auctioned off. Consumers who signed up for UnrollMe and had used the Lyft ridesharing application had their private emails taken and sold to Uber—the notorious competitor to Lyft. To be clear: Uber was paying top dollar for the private emails of thousands of Lyft users that were collected by Defendants while consumers were in the dark.

## II.    Defendants Exceeded the Limited Permission Given to UnrollMe to Secretly Read and Collect Data from Consumers' Private Emails.

26.    Defendants went to great length to distance UnrollMe from the Slice. Reasonable consumers viewing UnrollMe's marketing materials and going through the UnrollMe sign up process think that they are simply signing up for a service that will help them unsubscribe from annoying spam emails. What consumers don't know—and what Defendants have thus far successfully obfuscated—is that by giving UnrollMe access to their emails for the limited purpose of unsubscribing from spam, they have let the fox into the henhouse. By convincing consumers to trust UnrollMe, Slice was able to gain access to millions of consumers' private emails, from which it analyzes, collects, and sells information to third parties.

A.    *UnrollMe recognizes that its disclosures were not adequate.*

27.    According to UnrollMe's CEO and Co-Founder, "while [UnrollMe] tr[ied] [its] best to be open about [its] business model, recent customer feedback tells me [they] weren't explicit enough."[5] He continued, "[s]ure we have a <u>Terms of Service Agreement</u> and a plain-English <u>Privacy Policy</u> that our users agree they have read and understand before they even sign up, but the reality is most of us - myself included – don't take the time to thoroughly review them."[6]

28.    In its Privacy Policy, UnrollMe attempts to disclose that by using its service it *may* collect data from certain user emails. For instance, UnrollMe states:

> **Our Collection and Use of Non-Personal Information**
>
> We also collect non-personal information − data in a form that does not permit direct association with any specific individual. We may collect, use, transfer, sell, and disclose non-personal information for any purpose. For example, when you use our services, we may collect data from and about the "commercial electronic mail messages" and "transactional or relationship messages" (as such terms are defined in the CAN-SPAM Act (15 U.S.C. 7702 et. seq.) that are sent to your email accounts. We collect such commercial transactional messages so that we can better understand

---

[5]    Jojo Hedaya, *We Can Do Better*, UNROLL.ME (Apr. 23, 2017), http://blog.unroll.me/we-can-do-better/.

[6]    *Id.*

the behavior of the senders of such messages, and better understand our customer behavior and improve our products, services, and advertising. We may disclose, distribute, transfer, and sell such messages and the data that we collect from or in connection with such messages; provided, however, if we do disclose such messages or data, all personal information contained in such messages will be removed prior to any such disclosure.

We may collect and use your commercial transactional messages and associated data to build anonymous market research products and services with trusted business partners. If we combine non-personal information with personal information, the combined information will be treated as personal information for as long as it remains combined.

Aggregated data is considered non-personal information for the purposes of this Privacy Notice.[7]

29.     However, even reading the disclosure above in a light most favorable to UnrollMe (which is deficient), it is still inconsistent with UnrollMe's marketing materials and representations about what the service is and why consumers should sign up for it. As such, Defendants do not obtain proper consent for their clandestine business model of mining UnrollMe users' emails in order for Slice to sell their data. Put another way, UnrollMe heavily emphasizes throughout its marketing materials and website—including in the screenshots shown above—that it needs access to users' email accounts *specifically* to search for subscription emails that UnrollMe can assist in unsubscribing from. Consumers understand that tradeoff: give UnrollMe access to their personal (or business) email accounts in exchange for UnrollMe getting rid of annoying emails and potentially showing them advertisements or other productivity services or products. UnrollMe hides the fact that it actually scours your email for valuable data and then sells that through its parent company, Slice.

30.     The New York Times article mentioned above revealed that one company in particular that buys this supposedly anonymous email data is Uber, a company that's becoming best known for its alleged invasive tracking of individuals and large-scale data mining practices. However, it is worth noting that completely anonymous emails are likely of little value to a company such as Uber. Instead, these emails typically only have value when they have as many of

---

[7]     *Privacy Policy*, Unroll.Me, https://unroll.me/legal/privacy/ (last visited Apr. 26, 2017).

these details intact, meaning these supposedly "transactional" emails likely reveal tremendous amounts of information about UnrollMe's users. For instance, the screenshot below shows the contents of a typical Lyft "transactional" email that shows a picture and the name of the driver, the date, time, and distance of the trip, the total fare, and the precise pickup and dropoff locations. (*See* Figure 7, showing an example of an email receipt for a Lyft ride.)



(**Figure 7**.)

31.   Even assuming Defendants performed *some* level of anonymization (*e.g.*, removing first and last names and email addresses), it likely wasn't sufficient. Time and time again, researchers have revealed the ease in which they can identify particular people from purportedly anonymized data sources.[8] This is particularly easy to accomplish when the dataset is taxi trips,

---

[8]   *See* Mudhakar Srivatsa and Mike Hicks. 2012. *Deanonymizing mobility traces: using social*

like the Lyft data Defendants sold. In 2014, researchers analyzed a taxi dataset released by the city

of New York. As The Guardian reported:

> New York City has released data of 173m individual taxi trips – but inadvertently made it "trivial" to find the personally identifiable information of every driver in the dataset.
>
> The data could let malicious parties work out the home addresses of drivers, uncover their income, and retrace their movements across the city. But even without that, some users worry that the dataset also exposes passenger information to the world – which could reveal personal information about their journey points and times.[9]

32.     Indeed, a Lyft email receipt can reveal that information even if Defendants

attempted some anonymization technique, they may have overlooked information unique to the

consumer. Behind every Lyft email are unique identifiers that can identify each Lyft user. Figure 8

on the following page, shows an excerpt of code in a Lyft email receipt containing unique

identifiers that can identify the individual rider.

---

*network as a side-channel*. In Proceedings of the 2012 ACM conference on Computer and communications security (CCS 2012). ACM, New York, NY, USA, 628-637. DOI: http://dx.doi.org/10.1145/2382196.2382262; *see also* Anonymous *Usage of Location-Based Services through Spatial and Temporal Cloaking*. Marco Gruteser and Dirk Grunwald. MobiSys 2003.

[9]     *New York taxi details can be extracted from anonymised data, researchers say | Technology | The Guardian*, https://www.theguardian.com/technology/2014/jun/27/new-york-taxi-details-anonymised-data-researchers-warn (last visited Apr. 26, 2017).

(**Figure 8**.)

33.      The reputation of Uber, the company Defendants sold consumers' email data to, is also illuminating when considering the extent of any "anonymization." Uber has reportedly violated consumers' privacy when it, for instance, "Allegedly Stalked Users For Party-Goers' Viewing Pleasure" through the use of a "God mode," where it watched customers' trips in real time;[10] "secretly identif[ied] and tagg[ed] iPhones even after its app had been deleted and the devices erased,"[11] and updated its app to require consumers to allow Uber to track them even when not using the app. That last practice led to Senator Al Franken writing a sternly worded letter saying that "consumers have a right to clear and comprehensive information about what data are being collected about them, how the data are being treated, and with whom the data are being

---

[10]      *'God View': Uber Allegedly Stalked Users For Party-Goers' Viewing Pleasure (Updated)*, https://www.forbes.com/sites/kashmirhill/2014/10/03/god-view-uber-allegedly-stalked-users-for-party-goers-viewing-pleasure/#2bde726e3141 (last visited Apr. 26, 2017).

[11]      *Uber's C.E.O. Plays With Fire - The New York Times*, https://www.nytimes.com/2017/04/23/technology/travis-kalanick-pushes-uber-and-himself-to-the-precipice.html?_r=1 (last visited Apr. 26, 2017).

shared."[12] Given Uber's reported proclivity for invasive tracking, it likely has the means to re-identify the Lyft data Defendants sold to it.

34.     Ultimately, the millions of consumers who registered for UnrollMe's email "management service" had their privacy and trust violated. Consumers placed considerable trust in UnrollMe to access to their private and sensitive communications and UnrollMe, operating as a disguised for its parent, Slice, betrayed that trust by secretly combing through emails *en masse* and selling collected emails to anyone willing to pay.

### FACTS RELATING TO PLAINTIFF JASON COOPER

35.     Plaintiff Jason Cooper registered for an UnrollMe account in or around 2015. Before signing up for UnrollMe, Plaintiff saw UnrollMe's representations that UnrollMe would require access to his email account so that it could identify "subscription" emails that filled his email inbox. Plaintiff did not know that Defendants would actually use the access that UnrollMe acquired to read the contents of his emails and then sell that email data to third parties.

36.     While Plaintiff had UnrollMe, he sent and received thousands of emails. Defendants were not a party or an intended party to those emails (except for any emails UnrollMe may have sent as a part of the service).

37.     Unbeknownst to Plaintiff (and without his informed consent), Defendants intercepted and read the contents of his private emails. For instance, Defendants read Plaintiff's emails to identify "transactional" messages so that it could mine them for data and then sell that data to third parties.

38.     In addition, and unbeknownst to Plaintiff, Defendants exceeded the authorization UnrollMe had to Plaintiff's Gmail account, accessed his emails, read the contents of those emails to look for "transactional" messages that it could collect and sell to third parties.

39.     At no time did Plaintiff consent to Defendants' interception, reading, monitoring, or

---

[12]    *Sen. Franken Presses Uber to Upgrade Privacy Policy, Protect Users' Sensitive Location Data | Al Franken | Senator for Minnesota*, https://www.franken.senate.gov/?p=press_release&id=3593 (last visited Apr. 26, 2017).

1  use of the contents of the emails he sent or received for any purpose other than "cleaning up" his

2  inbox.

3  **CLASS ALLEGATIONS**

4      40.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of

5  himself and two Classes of similarly situated individuals, defined as follows:

6
7  > **ECPA Class**: All individuals in the United States who (i) sent or received one or more emails (ii) where Defendants were not a party to the emails, and (iii) while they had UnrollMe installed.

8  > **SCA Class**: All individuals in the United States who (i) installed UnrollMe (ii) on email accounts where one or more emails were stored.

9  Excluded from the ECPA Class and SCA Class (collectively the Classes, unless otherwise

10  indicated) are: (1) any Judge or Magistrate presiding over this action and members of their

11  families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any

12  entity in which the Defendants or their parents have a controlling interest and their current, former,

13  purported, and alleged employees, officers, and directors; (3) counsel for Plaintiff and Defendants;

14  (4) persons who properly execute and file a timely request for exclusion from the Classes; (5) the

15  legal representatives, successors, or assigns of any such excluded persons; and (6) all persons who

16  have previously had claims similar to those alleged herein finally adjudicated or who have released

17  their claims against Defendants.

18      41.    **Numerosity**: The exact number of members in each Class is unknown to Plaintiff at

19  this time, but on information and belief, there are tens of thousands of people in each of the

20  Classes, making joinder of each individual member impracticable. Ultimately, members of the

21  Classes will be easily identified through Defendants' records.

22      42.    **Commonality and Predominance**: There are many questions of law and fact

23  common to the claims of Plaintiff and the other members of the Classes, and those questions

24  predominate over any questions that may affect individual members of the Classes. Common

25  questions for the Classes include but are not limited to the following:

26
27  > (a)    whether Defendants obtained adequate consent to intercept and/or access Plaintiff's and the Classes' emails for the reasons discussed

28

above;

(b)   whether Defendants obtained adequate consent to intercept and/or access Plaintiff's and the Classes' emails for only the purpose of identifying "subscription" emails;

(c)   whether Defendants intercepted Plaintiff's and the Classes' emails for purposes other than the identification of "subscription" emails;

(d)   whether Defendants used the contents of Plaintiff's and the Classes' emails for their benefit;

(e)   whether Defendants accessed Plaintiff's and the Classes' emails for purposes other than the identification of "subscription" emails;

(f)   whether Defendants' access of Plaintiff's and the Classes' emails for purposes other than the identification of "subscription" emails exceeded the authorization they were provided;

(g)   whether Defendants' conduct violates the ECPA;

(h)   whether Defendants' conduct violates the SCA; and

(i)   whether Plaintiff and the members of the Classes are entitled to equitable relief as well as actual, statutory, and/or punitive damages as a result of Defendants' conduct.

43.    **Typicality**: Plaintiff's claims are typical of the claims of all the other members of the Classes. Plaintiff and the members of the Classes sustained substantially similar damages as a result of Defendant's uniform wrongful conduct, based upon the same acts that Defendants made uniformly with Plaintiff and the public.

44.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Classes.

45.    **Policies Generally Applicable to the Classes**: Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Classes.

46.    **Superiority**: This case is also appropriate for class certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendants' misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

47.     Plaintiff reserves the right to revise the Definitions of the Classes and Class Allegations based on further investigation, including facts learned in discovery.

**FIRST CAUSE OF ACTION**
**Violations of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2510, *et seq.***
**(On Behalf of Plaintiff and the ECPA Class)**

48.     Plaintiff incorporates by reference the foregoing allegations.

49.     The ECPA prohibits any person from intentionally intercepting any electronic communication or from intentionally using, or endeavoring to use, the contents of any electronic communication while knowing or having reason to know that the information was obtained through the interception of an electronic communication. 18 U.S.C. § 2511(1) (a), (c), (d).

50.     Defendants are each a "person" under the ECPA, which is broadly defined to include "any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

51.     Emails are "electronic communications" under the ECPA, which are broadly defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any

nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

52.     Plaintiff and the members of the ECPA Class sent or received "electronic communications" while having the UnrollMe installed.

53.     Defendants intercepted, read, and used (and sought to use) the emails sent or received by Plaintiff and each member of the ECPA Class between the time each such message was sent, on the one hand, and the time such message was read by the recipient. In doing so, Defendants used electronic, mechanical, or other devices (i.e., their UnrollMe code) to automatically acquire and read the content of the emails in the course of each such message's transmission.

54.     Defendants intentionally used, or endeavored to use, the contents of these emails while knowing or having reason to know that the information was obtained through the interception of an electronic communication.

55.     Defendants' actions as complained of herein have been intentional, as evidenced by the design and implementation of their UnrollMe service.

56.     No party to the electronic communications alleged herein consented to Defendants' interception or use of the contents of the electronic communications. Nor could they, because Defendants never sought to obtain consumers' consent for their practices exceeding the "subscription" email management.

57.     Plaintiff and members of the ECPA Class suffered harm as a result of Defendants' violations of the ECPA, and therefore seek (a) preliminary, equitable and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and the profits obtained by Defendants as a result of their unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(2)(B), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

**SECOND CAUSE OF ACTION**
**Violation of the Stored Communications Act**
**18 U.S.C. §§ 2701, *et seq*.**
**(On Behalf of Plaintiff and the SCA Class)**

58.     Plaintiff incorporates by reference the foregoing allegations.

59.     Defendants intentionally accessed without authorization or exceeded authorization to access a facility through which an electronic communication service is provided and obtained electronic communications while in electronic storage.

60.     As described above, Defendants advertise UnrollMe as a service that helps consumers find and eliminate so-called "subscription" emails. Defendants do not disclose in UnrollMe's advertisements or marketing materials that consumers using the UnrollMe are added to Slice's "panel" of online shoppers (through which Defendants obtain users' emails and sell data from them to third parties) but rather attempts to generally disclaim that in the UnrollMe Privacy Policy.

61.     As such, to the extent Defendants obtained any authorization to access the emails of Plaintiff and members of the SCA Class, Defendants exceeded the scope of that authorization by accessing emails for purposes other than the identification of "subscription" emails.

62.     Plaintiff's and members of the SCA Class's cloud based email accounts, including Gmail, Hotmail, Yahoo email, and AOL email, are facilities under the SCA.

63.     Plaintiff's and members of the SCA Class's emails are electronic communications as defined by 18 U.S.C. § 2510 (12) because they are writings or the other transfer of data or intelligence that were sent or received over the internet, which affects interstate commerce.

64.     And at the time Defendants accessed Plaintiff's and the SCA Class's emails, the emails were in electronic storage. The emails were stored by the cloud email provider (*i.e.*, the electronic communication service) for future access by Plaintiff and members of the SCA Class. That is, the cloud email providers kept the emails for the purpose of backup protection.

65.     At all times, Defendants' actions as complained of herein have been intentional, as evidenced by the design and implementation of using their UnrollMe software as a backdoor for Slice's data mining practices.

66.     Plaintiff and members of the SCA Class have been aggrieved by Defendants' violations of the SCA, and therefore seek (a) preliminary, equitable and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and the profits obtained by Defendants as a result of their unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2707(c), whichever is greater, (c) punitive damages, and (d) reasonable costs and attorneys' fees.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Jason Cooper, individually and on behalf of the Classes, prays for the following relief:

A.     Certify this case as a class action on behalf of the Classes defined above, appoint Jason Cooper as representative for the Classes, and appoint his counsel as counsel for the Classes;

B.     Declare that Defendants' actions, as described herein, violate the ECPA and SCA;

C.     Award injunctive relief as necessary to protect the interests of Plaintiff and the members of the Classes, including, among other things, an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

D.     Award equitable relief including, among other things, nonrestitutionary disgorgement, as necessary to prevent Defendants from profiting from the wrongful and unlawful acts described herein;

E.     Award damages, including:

     i.     the greater of (a) the sum of actual damages suffered plus any profits Defendants earned through their unlawful conduct, and (b) the greater of $100 per member of the ECPA Class, per day of Defendants' violations, or $10,000 per member of the ECPA Class, pursuant to 18 U.S.C. § 2520(c)(2);

     ii.     the greater of (a) the sum of actual damages suffered plus any profits Defendants earned through their unlawful conduct, and (b) $1,000 per member of the SCA Class, pursuant to 18 U.S.C. § 2707 (c); and

     iii.     punitive damages, where applicable, to Plaintiff and the Classes in an

1        amount to be determined at trial;

2        F.    Award Plaintiff and members of the Classes their reasonable litigation expenses and

3  attorney's fees;

4        G.   Award Plaintiff and members of the Classes pre- and post-judgment interest, to the

5  extent allowable; and

6        H.   Award such other and further relief as equity and justice may require.

7                             **JURY TRIAL**

8     Plaintiff demands a trial by jury for all issues so triable.

9                         Respectfully submitted,

10                     **JASON COOPER**, individually and on behalf

11                     of all others similarly situated,

12  Dated: April 26, 2017         By: /s/ Nina Eisenberg
                             One of Plaintiff's Attorneys

13

14                     Nina Eisenberg (SBN – 305617)
                     neisenberg@edelson.com

15                     EDELSON PC
                     123 Townsend Street

16                     San Francisco, California 94107
                     Tel: 415.212.9300

17                     Fax: 415.373.9435

18                     *Attorneys for Plaintiff and the Putative Classes*

19

20

21

22

23

24

25

26

27

28